May it please the Court, I'm Joshua Cochran, I represent the Swangers, who are the plaintiffs and appellants in this matter. I would request to reserve three minutes of rebuttal time. This appeal concerns a series of discovery orders and a grant of summary judgment. The central issue really does concern the discovery orders which dealt with the perpetrator, in this case, Dwayne Madison's psychotherapist privilege and whether he had waived it impliedly. Some of the questions that have arisen concern whether federal law would govern a privilege claim in this case, and the case involved federal and state issues at the same time. And I believe the issue was settled once and for all in Pearson v. Miller when this Court held definitively that in cases involving mixed federal and diversity cases that the federal privilege law would be the controlling standard. But didn't Pearson go farther than that and don't we have in the jurisprudence a recognition that state law can still inform federal privilege law? Yes, that is correct. In the interests of comedy and federalism, we don't just look at whether there's a federal privilege and what it is and what is its breadth, but we can also have it informed by parallel and similar state privileges. Yes, that is correct. So isn't that appropriate here or wasn't it appropriate here for the district court to do? And if so, is the real issue here whether that's what the district court in fact did? I believe that is in fact one of the key issues dealing with the psychotherapist privilege. It is true that when applying federal privilege law, the court can look to state confidentiality statutes to inform that. It is clear looking at the court's resolution of the issue that the court did not look at that in kind of an interest balancing analysis. Rather, what the court went ahead and did and the final application of that would have occurred in December 31st, 2014, the court kind of reversed field and went ahead and actually applied directly the MHPA and state privilege law, which is broader and the MHPA protects basically anything. More than just communications. Exactly. Anything concerning. Yes, it's a significantly broader thing. The court relied on Jaffe, but Pearson had been decided and it didn't really reference Pearson. Right. And it's somewhat ironic, quite frankly, because when the court generated the order on July 7th to look into some of these issues, I went back through the record and I found on January 3rd of 2013, it's document 71, the court issued an order in which it directly cited Pearson and quoted it as the governing standard in this case. And that followed a discovery conference between all counsel in the court. I was not present for that. I'm arguing the appeal, but that was established as the law of the case at that point. Now, you didn't really focus on this until your reply brief. So I'm wondering how we should view that, whether it was waived. But it was also in the district court, you didn't object to it, did you? Yes, starting with the district court, it wasn't an issue at all, was it? An issue with the district court is because it was established, as I say, as the law of the case, if you will. The district court asked for a briefing even on this issue, didn't it? The district court, as we read that order, and I believe that goes to whether any type of waiver would be enforced, the district court was looking at the scopes of the privileges. Well, exactly. And couldn't you have helped and couldn't you have, upon the court's ruling, given any disagreement you had with it, have called the court's attention to that? And yet you had, what, how many months before summary judgment was granted and you didn't do that? Well, that was the court's final determination on discovery. We had filed a motion for reconsideration. Did you say final? Final determination for discovery. You didn't, you felt powerless to do anything about it? Well, you could file a motion for reconsideration, but a motion for reconsideration is not a requirement to avoid waiver. But I'm not asking about a requirement. We're talking about the court having ruled in a way that you think was outright wrong and which appears to be, if not in conflict with Pearson, appears to have not given Pearson appropriate attention or accurate recitation and yet you do nothing about it and then you don't even raise it in your blue brief when you're here. I did raise it in the blue brief. I believe... How? How was the argument put forth to this court except until, as Judge Rendell has indicated in your reply brief? It was in the opening paragraph of the standard where we cited clearly and unambiguously to the effect of Pearson as being controlling in these cases. Yeah, but I don't think you said the district court applied the MHPA improperly based on Pearson until your reply. You may have discussed substantively the privilege in Pearson, but you did not bring to our attention then in your blue brief the error that you now contend that the district court committed, did you? It is true that I focused on it in the reply brief. Well, let's put aside focus. Did you even mention the district court's error in your blue brief? I believe I did. So what should happen? You would say it gets remanded and the district court should look at the documents based upon the more limited federal common law principle, is that correct? If that is the way the court goes, our primary argument is, and this is what I really focused on in the blue brief, is that the defendant waived his psychotherapist privilege and waived it by acting fundamentally inconsistent with it. He released, while counseled, over 90 pages of detailed psychological treatment records, including treatment records from the DTA defendants who were providing the court-ordered mental health care for him at the time that he committed these acts. There is that. He also, again counseled, testified at length, great length, at his deposition. Now, the questions posed to him were not probing and detailed, but they were broad-based, ranging, and there was never any mention of the privilege. The privilege came up, in fact, once DTA was joined as a defendant. And that's been our issue with this case all along, is that the defendant who holds the privilege did not raise it. It was raised by the party who stands to benefit from this shield. But he has asserted the privilege. He has asserted it now, post-de facto. After the horse left the barn, so to speak, he disclosed, as I say, over 90 pages of detailed psychological records. He also, in his answer in affirmative new matter, raised his mental state as a defense. In discovery responses, again, he identified the October 25, 2010 report, detailed report, which has sorted details of what DTA knew at the time, October of 2010, still before these alleged abuse incidents. That indicated that Madison was having, he was guaranteed to become recidivist. He had killed a chicken during a sex act. I mean, these are... But that's not a waiver of the privilege for the disclosure of communications between the patient and DTA. The records, and that record in particular, cites page after page of reports from Madison to his psychotherapist. And under those circumstances, and this goes to what the court, the court actually found a limited waiver. It's unfair to find a limited waiver in this case. This is not like an attorney-client privilege case where what you're looking at getting is not really part and parcel of the litigation. This is the litigation. I mean, to prevail, we need to show what people knew, when they knew it, and how they handled that information. And therefore, it would be inequitable to enforce a limited waiver. What is it that you want, discovery-wise? Assuming we get by the waiver issue that we asked you about at the outset, assuming that we take on the question of continued discovery, what do you want? We want the 1,500 pages. All of them? All of them. Why? Because they will detail what these defendants knew. Isn't there a discovery log or a log of documents here? There is, and they have asserted the privilege with respect to all of those documents that they did not turn over. Well... But your real reason for saying you're entitled to it is that he has waived the privilege? Yes, and it's inappropriate, and that deals with Pearson as well. Pearson holds that it's inappropriate for the psychologist to assert the privilege. The privilege is held by the patient. But the patient doesn't necessarily understand the privilege. His counsel does, and these actions that were inconsistent occurred while he was counseled. And there was a deposition with counsel, and then discovery disclosures through counsel, including using that October 25, 2010 DTA report with the lower details as a Crawford expert report. And actually, it was a two-fold expert report, and both of the documents were DTA documents. Just very briefly, I would like to talk about the state-created danger in the special relationship. The trial court granted summary judgment against us on those claims. As you know, the Third Circuit has a pretty tough underbrite jurisprudence in this area. I agree. How do you get by that? Here's what we're arguing with respect to the state-created danger. Both of these defendants, the school defendants and the DTA defendants, knew... What's the affirmative action? The affirmative action is seating Madison in that classroom. They had to seat him somewhere. Next to her. They didn't have to seat him in there. But what did they know about her, or about him and her, that would make that even an ill-advised action? Here's what they knew. They knew that she was moderately mentally retarded, largely nonverbal. Madison, they knew his history. He's been a repeat. But you're not suggesting they shouldn't have put him next to a female child. You're asserting that they shouldn't have put him next to her? I'm asserting that they shouldn't have put him in that special needs classroom. Here's what the reference that we have. They show that Madison has a history of targeting. Well, who knows that? Who at the school knows that? What we have is the assistant principal, the principal, and the two teachers. They knew about the Swartz incident. But what else did they know? They knew, here's what we... They didn't know about the chicken. They didn't know about the... They didn't know about the chicken. That's correct. And this child, the victim of this assault, had never reported anything to school officials about any untoward attentions by him, had she? No, and that's part of the problem. They knew she was largely nonverbal. She doesn't have... Well, but doesn't that make it even more difficult for you on the affirmative act prong of our cases when it... in this claim? I don't believe so, because Madison was so predisposed to do exactly what he did. Do you have anything? No, I'm off stage. We'll have you back on rebuttal, Mr. Cochran. Thank you very much. I see that Appley's time has been divided up. Let me just indicate it's a long afternoon for us. We're perfectly willing to work hard, but we have another major case after this. So we're going to pretty much hold you to the clock, gentlemen. Mr. Brenner? May it please the court. We've talked among ourselves. I think in terms of logic of the issues that the court's already raised, it's going to make sense for me to address the waiver issue and the issue of the MHPA. Mr. Blackwell's client was Mr. Madison. He's going to address the waiver issue briefly, and then Mr. Crow will finish up with issues with regard to the school district. So in terms of our order of presentation, if you will... Blackwell next, Mr. Blackwell. That's fine. The court has already indicated what I saw the problem with as we came forward. I looked at the... Mine's a white cover, but the blue cover brief that you had. I made a copy of it. That's why it's got a white cover. And saw no reference at all to the MHPA argument. As I prepared for the argument before you today, I read the gray cover, the reply brief, and there, for the first time, it was asserted. What page is this?  It's a short. Let's see. Two, three, four. Thank you. Gray cover brief. Appreciate what happened in the court below. The trial judge had four different occasions when he looked at this issue of discoverability of records of my client DTA. And if you trace the procedural history as we set forth, he issued four orders and four opinions. Curiously, as I prepared for argument and went through what was attached to the blue brief, the one opinion that plaintiff's appellants failed to attach to that brief was a December 30th, 2014 opinion by the trial court, which is in the appellant's record, starting at page R833. But it's a multiple-page analysis by the trial judge looking at, again, the federal psychotherapist protection set forth in Jaffe, which was addressed in the three prior opinions by the court. And here we are. Why did the MHPA come up? We're dealing with, at that point in time, the court in June issued an order and said, counsel, I want you to produce copies of the DTA records, but I want both sides to brief this in detail before I decide if I'm going to look at those records. So we assembled the records, sent them to the trial court, and both sides briefed this. And besides relying upon Jaffe, I thought, perchance, is the trial court going to decide there's been some waiver or back off from that? So I expanded my analysis as to reasons why the DTA records shouldn't be available. The Hahnemann case from this court clearly indicated a belief that the scope of the protection provided in the MHPA and recognized this case at the trial court level asserted both state and federal claims. I looked at Rule 501, the federal rules of evidence, the privilege rule, which specifically indicates that if there's a state privilege involved, you're supposed to review that. I looked at those cases and made a twofold argument to the trial judge before his decision in December and said, the federal privilege applies, as you've said so far, and therefore there should be no disclosure of these records. But if for some reason you don't think there should be, and during that time frame this issue of partial waiver and what that mean had been raised, I said, look at the MHPA, look at the Pennsylvania psychotherapist privilege, look at Rule 501, and under all of those collectively, these documents should not be discoverable. If your court reviews the trial judge's December 30th opinion, again, which is in the large record but not in the blue. Was there more than one December 30th opinion? There was an order. It's in the order. OK, because there's a December 30th order in here. I've read all the opinions. What's the appendix reference? The appendix reference are 833A is the first page of that, and it runs for about 12 pages after that. And I think it was oversight. I'm not sure why. But the point is, I think if this court would have had that with the blue brief, we may not have had the questions that the court posed for counsel to be prepared to answer because I think the trial court has addressed them and went through an analysis of both the federal privilege and these other statutes and concluded that there had not been, to their satisfaction, again, an abuse of discretion standard, that the privilege had been waived so as that all the DTA records should be produced to counsel. The privilege had been waived. The privilege, the court's words, privilege had been waived in a limited manner because certain records had been produced. Appreciate the timing of this. All right. So the privilege, so that's, so he should, so they should have all the documents. No. The court said, looking at where we were, the deposition of Mr. Madison was taken before my client was a party to the case. In preparation for that, there had been discovery of some documents between his counsel and plaintiff's counsel, and there were two DTA records produced and a number of other records historically from, I think, county agencies that had dealt with him. These are the 90 pages that counsel referred to a moment ago. All right. But are you saying that opinion says the privilege was waived? The court said we view the disclosure of those documents as a limited waiver. In other words, a waiver as to what has been turned over. And the court talks about there's a lot of historical information there that was in those When we became involved in the case, received written discovery, we said, isn't this privileged under the federal privilege? That came up. Madison and his counsel said, yes, we agreed with that. And then we get into this issue of whether what had happened before we were involved in the case somehow created a waiver. Pearson was cited here. Pearson involved a written waiving of the right to non-disclosed records. There was a written waiver that was relied upon the trial court level and referenced in this court's opinion with regard to that. We don't have a written waiver here. We have a court's analysis of what happened at a deposition and documents produced in conjunction with the deposition and the conclusion that the only way we can resolve that is to those documents, but not a full-blown waiver so as to require my client to produce 1,500 pages of records, many of which well predate the point in time where this incident occurred. Recall, and the facts are reflecting the record, Mr. Madison was in the care of my group from about 2007 through about 2012. 1,500 pages of records involved psychological meetings, notes, counseling records, things that date from the point in time he came into our program until the point in time when he finished with our program. So twofold position from where I stand and I'll sit down. Number one, we agree with the court's questions as raised earlier. The issue of MHPA was not preserved at any point. That issue was mentioned when you look at the opinion of the trial court that I referenced. That issue was mentioned at that point in time. There was no argument made by plaintiff's counsel at that time. Hey, court, that doesn't apply to this case. Appellate briefs were written, no reference to it until we get to the gray brief, which we agree with the question as posed by the court. We think it's too late and therefore waived. We believe the federal privilege does apply in this matter. And again, I'm going to ask the court to look at the opinion of the lower court. In addition to that I just referenced, and I see my time is up. There is our privilege law, an extensive privilege law. But you said you believe the federal common law and not the MHPA applies here? The federal, I believe that the privilege recognized in Jaffe is applicable, which was what the lower court said and then said in addition to that the MHPA provides protection. We think this is a Jaffe case. There's been no waiver and therefore our records are not discoverable. And I just wanted to reference, so you and your staff have it and of course I'm not finding it right now. Well, you can supply it to us. We have produced in the records the privilege law and it's an extensive document that shows the type of documents that issue in the case. Thank you, Mr. Brenner. Mr. Blackwell? May it please the court, Donald Blackwell. I'm here for Dwayne Madison. The district court made the right decision here with regard to the waiver issue. Clearly, an eight-page report from DTA and keeping in mind that the request here was from the plaintiffs to DTA specifically, the report was produced. It was a mistake by our office to do that. And in deciding what we were going to do about the production of the report, the trial court was asked at a deposition to make a ruling on what was going to be the result of this report. I think the trial court did exactly what was reasonable under the circumstances in indicating that there was a limited waiver with regard to parts of the report and that other parts of the report were protected. There is a concept in federal law which deals with partial waiver and I believe that that would support the trial court's decision here when a party who has disclosed a portion of privileged communications can continue to assert the privilege even though they have waived other parts of the documentation. I would also suggest to you that a fair reading of the deposition here of Dwayne Madison would not waive the psychotherapist patient privilege in any way. The deposition, he did talk about things that happened to him at the school. He testified in detail about what he had done to this young girl, but he did not get into any detail with regard to his treatments at DTA or any diagnoses or anything like that. With regard to the affirmative defense that they have alleged, the affirmative defense is something that we raised with respect to the punitive damage claim here and I would suggest if you take a look at what we raised in our answer and new matter that that does not rise to the level of waiving, it does not waive the psychotherapist privilege. And I would also suggest to you that there is no prejudice here to the plaintiffs with regard to the failure to disclose these mental health records. Their expert indicates that there was no evidence to suggest that the DTA indicated anything about Mr. Madison to the school district, which is inconsistent with their suggestion to the court that if only we had these 1500 pages of documents that would somehow link up what the school district knew about his history from DTA. But there are claims against DTA that you could help them with? Yes. Basically, I was asking the same question. All right, your time has expired, Mr. Blackwell. Thank you. Mr. Crowell. Thank you, Your Honor. May it please the court. Rolf Crowell on behalf of Warrior Run School District and the individual Warrior Run defendants. Do you want to address the microphone, please? Absolutely. Your Honor, I'll be happy to reserve my comments to Warrior Run, although I note that my able colleague on behalf of the plaintiff has spent very little time on the actual substantive claims except to discuss DeShaney and its progeny a little bit. So I'll start there unless the court has any questions. Okay. Judge Smith, you pointed out right out of the gate that DeShaney and the LR and Bright, they're all very tough standards, all involving far more egregious behavior known by the relevant actors than there were known by the relevant actors here. My able colleague came up with a comment to this honorable court that they knew that this young man was involved in targeting, and there's just no evidence of record to support that. The evidence of record, as pointed out by a detailed and precise analytical 50-page opinion by Judge Mariani, was that the only person that had any knowledge of any substance of this young man's proclivities was the assistant principal. With respect to him, it was Ms. Schwartz, and it was a one-time incident, and it involved talking and not touching, as it turned out, at least based upon the investigation. So it's a vastly different circumstance than the LNR case where there were months of molestation alleged in a room where the teacher was present over a long period of time. And the tragic DeShaney case where Joshua, where the children and youth supposedly knew about Joshua, and they just didn't act in time. And of course, the final case, Bright, where a similar situation, only even a more tragic result, we don't have any of that here. So what the district court did in this case was they undertook what was kind of a water gate analysis. What did the school district know? When did they know it? And then what did they do with it? And under each of these high standards, whether it's the Title IX actual notice and deliberate indifference standard or the Rehabilitation Act standard, which again requires a link between the actual discrimination, the disability and alleged discrimination, or the state created danger or the breach of fiduciary duty, all of those standards are so high. And all of the proof posited is so unconvincing, so weak. As the court pointed out, I think what my able colleague will point this court's attention to is the placement of the child. That's as close as they can really get because none of the teachers knew anything. And so if they didn't know anything, how can the placement of the child be an issue? Simply put, it can't. I'm not suggesting for one second that this isn't tragic. No, there are no winners in this case, for sure. But I would say that with respect to the one issue about which this court has been most interested, the discovery issue and the waiver issue, I would simply point this court's attention to the disparate position that the school district finds itself in with respect to the other folks in this case. And that is that there is still no evidence that the school district was ever placed on any notice. So unless these documents themselves, to the extent they're produced, unless they themselves demonstrate a production to the members of the warrior-run school districts and the individual defendants, then I can't see how this court should not base its decision with respect to the district court's order based upon the record before it. So to the extent there is some order that's going to produce documents or an in-camera inspection or something along those lines, all of which are arguably warranted under the Pearson analysis, I would respectfully submit that part of that should then be whether any of those documents actually reflect a dissemination to the warrior-run defendants. Because absent that, there should be no change in this court's determination. Thank you very much, Mr. Crow. Mr. Cochran, may I have rebuttal? Thank you, Your Honor. Just a couple of very brief points. Evidence of record as of now, with the limited records that we have, that the school knew that Madison was likely to sexually offend. Teachers and staff were watching closely in the class. This document is dated the date that Madison was taken out of the school by DTA after he had abused a plaintiff. And the issue there is the teachers and staff were watching him. They knew he had a problem. They were watching him closely in class. They still left him seated there next to her. Furthermore, Madison testified at his deposition that he confided directly to the assistant principal about his history of sexual abuse in the past. He'd been getting a hard time with kids. It was bothering him. And he took it to the assistant principal. With respect to an argument that was made by co-counsel or counsel for Madison, limited waiver is a hardship. We need these documents to make a tight case under the heightened standard that you have correctly referred to today. I believe we still have enough to get past summary judgment where we are. But even if we do, when we get to a jury, it's important stuff. I thank you for your time. Thank you very much, Mr. Cochran. Thank you to all of counsel for your helpful arguments. As everyone has acknowledged, this is a tragic case. It's also a difficult case. We thank you for helping us on that. We'll take the matter under advisement.